**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for FIRST CHICAGO BANK & TRUST, an Illinois chartered bank, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 11-cv-5902 |
| LOWIS & GELLEN, LLP, an Illinois limited liability partnership, and ROBERT D. LEAVITT, | ) ) ) ) | Judge Robert M. Dow, Jr. |
| Defendants/Third-Party Plaintiffs, | ) ) | |
| v. | ) ) | |
| KATTEN MUCHIN ROSENMAN LLP, an Illinois limited liability partnership, WILLIAM J. DORSEY, and JOHN P. SIEGER, | ) ) ) ) ) | |
| Third-Party Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Third-Party Defendants' motion to dismiss the third-party complaint against them [28]. For the reasons stated below, the Court denies the motion. Per the parties' oral request at the February 14, 2013 motions hearing, and the terms of the Court's earlier order [31], the Court lifts the stay that has been in place during the pendency of the instant motion to dismiss. The parties are directed to confer and to submit a proposed discovery plan by March 15, 2013.

**I. Background**

First Chicago Bank & Trust ("First Chicago") retained Defendant Robert D. Leavitt and the law firm for which he was "of counsel," Lowis & Gellen, LLP (collectively "Defendants"),

1

to provide legal advice and represent it in the negotiation and documentation of a secured loan facility to IFC Credit Corporation ("IFC"). In December 2007, First Chicago agreed to extend a loan of $5 million to IFC. First Chicago allegedly directed Defendants to prepare the loan documentation so that First Chicago would have a properly perfected first security interest in the collateral. Defendants negotiated and prepared a loan agreement, promissory note, and security agreement, which First Chicago and IFC executed in mid-December 2007. First Chicago, through its receiver, Plaintiff Federal Deposit Insurance Corp. ("FDIC"), alleges that the security agreement expressly granted First Chicago a first priority security interest in the loan collateral, which FDIC alleges is characterized as "chattel paper" under the Illinois UCC, 810 ILCS 5/9-102(11).

FDIC alleges that pursuant to 810 ILCS 5/9-313(a) of the Illinois UCC, a secured party may perfect a security interest in this type of collateral by taking possession of it. Under certain circumstances, a secured party may be deemed to have possession of its collateral if another party holds the collateral for the secured party's benefit. These circumstances allegedly do not include situations wherein the debtor (here, IFC) holds the collateral for the secured party. See 810 ILCS 5/9-313(c).

The security agreement drafted by Defendants allegedly nonetheless appointed debtor IFC and its agents as First Chicago's custodian for the purpose of holding and safeguarding the collateral "so as to perfect [First Chicago's] security interest therein until such time as [First Chicago] releases its interest in" the collateral. FDIC alleges that First Chicago was unaware that that its security interest was not actually perfected, and that Defendants did not advise it to the contrary.

In late March 2008, a paralegal at Defendants' office e-mailed First Chicago to remind it to file UCC-1 financing statements. Defendant Leavitt was copied on the e-mail. First Chicago replied, indicating its understanding, based on Defendants' advice, was no UCC-1 filing would be necessary because the funded leases had been on the books for less than 90 days. FDIC also alleges that First Chicago "reasonably believed its Security Interest was perfected through IFC's possession of the Collateral." FDIC further alleges that neither Defendant Leavitt nor anyone else at Defendant Lowis & Gellen responded to First Chicago's reply.

In May 2008, First Chicago and IFC agreed to raise IFC's loan cap from $5 million to $10 million. First Chicago enlisted Defendants to prepare an amendment to the security agreement to facilitate the increase. The amendment became effective May 20, 2008.

In 2009, First Chicago allegedly retained Third-Party Defendants William J. Dorsey, John P. Sieger, and the law firm of which they are partners, Katten Muchin Rosenman LLP (collectively "Third-Party Defendants"), to represent it in connection with certain matters related to IFC. Upon reviewing the IFC file, Third-Party Defendants allegedly concluded that First Chicago's security interest in the collateral had not been properly perfected and that no UCC-1 financial statements had ever been filed. Third-Party Defendants filed a UCC-1 statement for First Chicago against IFC on June 4, 2009.

By June 2009, FDIC alleges, IFC had double-pledged approximately $4.5 million of the collateral securing First Chicago's loan. FDIC further alleges that IFC defaulted on its loan with First Chicago and refused to return the collateral. FDIC alleges that it was thus "left with no choice but to file a complaint and emergency motion for the appointment of a receiver and temporary restraining order against IFC." Third-Party Defendants filed these documents in state court on July 7, 2009. That same day, the state court entered a temporary restraining order

enjoining IFC from transferring or dissipating collections, accounts receivable, or case. Other creditors of IFC subsequently joined the suit, and the temporary restraining order was extended by agreement of the parties to July 27, 2009.

During a hearing on July 27, 2009 IFC informed the state court – and First Chicago – that it was in the process of filing a bankruptcy petition. IFC filed a Chapter 7 bankruptcy petition in the Northern District of Illinois that same day. First Chicago's Proof of Claim submitted in that action alleges that IFC owed First Chicago over $9.8 million as of the petition date.

On August 25, 2009, First Chicago filed a lawsuit in state court against former officers and directors of IFC. FDIC alleges that First Chicago suffered actual damages in prosecuting the suit, and further alleges that IFC's alleged misconduct was "facilitated by Defendants' negligence and malpractice."

On November 30, 2009, IFC's Bankruptcy Trustee initiated an adversary proceeding against First Chicago in which he sought to "(i) avoid, pursuant to § 544 of the Bankruptcy Code, First Chicago's Security Interest in the Collateral; (ii) avoid, pursuant to § 547 of the Bankruptcy Code, First Chicago's lien on the Collateral as a preferential transfer initially perfected during the ninety days prior to the Petition Date ('the Avoidance Period'); (iii) avoid and recover, §§ 547 and 550 of the Bankruptcy Code, payments made to First Chicago under the Loan during the Avoidance Period in the amount of $566,392.53 * * *; (iv) avoid and recover, pursuant to §§ 549 and 550 of the Bankruptcy Code, payments made by lessees of the Collateral to First Chicago after the Petition Date in the amount of $12,366.12 * * * and (v) disallow any and all claims of First Chicago against IFC under the Loan pursuant to §§ 502(d) and 550 of the Bankruptcy Code." First Chicago entered into a settlement agreement with the Trustee to resolve the adversary proceeding on December 1, 2010. Pursuant to the settlement agreement, First

Chicago agreed to return $200,000 of the claimed $566,392.53 to the Trustee. Additionally, First Chicago's security interest in the collateral was avoided, and First Chicago assigned all its interest in the collateral to the Trustee. FDIC alleges that First Chicago was left with only an unsecured claim against IFC, whose liabilities far exceed its assets.

In May 2011, First Chicago filed in state court a two-count complaint alleging that Defendants committed professional negligence or legal malpractice and breached their contract with First Chicago. In July 2011, the Illinois Department of Financial and Professional Regulation's Division of Banking closed First Chicago. Plaintiff Federal Deposit Insurance Corporation ("FDIC") was appointed to be First Chicago's receiver. As receiver, FDIC was substituted for First Chicago in the state court action against Defendants. FDIC removed the case to this Court.[1] FDIC alleges that as a result of Defendants' malpractice, breach of contract, and/or negligence, First Chicago's security interest in the collateral was avoided, First Chicago returned $200,000 in settlement of the adversary proceeding, and First Chicago incurred legal fees and expenses defending its interests. FDIC alleges that First Chicago, "as a direct and proximate" result of Defendants' alleged negligence and/or breach of contract, "has incurred damages of at least $10,056,392.80," plus legal fees and expenses associated with protecting its interests in this and other legal actions.

Defendants asserted several affirmative defenses to FDIC's allegations. Defendants' affirmative defenses include allegations that First Chicago was contributorily negligent and failed to mitigate its damages. They also include allegations that FDIC's claims are barred by the intervening and superseding negligent acts or omissions of successor counsel Katten.

---

[1] Pursuant to 28 U.S.C. § 1819(b)(2), any suit in which FDIC is a party is "deemed to arise under the laws of the United States," and FDIC "may, without bond or security, remove any action * * * from a state court to the appropriate United States district court before the end of the 90-day period beginning on the date * * * [FDIC] is substituted as a party."

5

Defendants also filed a third-party complaint for contribution against Katten and two of its partners, Sieger and Dorsey [19]. In the third-party complaint, Defendants allege that the "bulk of the relief sought by the Trustee was a direct consequence of [Third-Party Defendants'] negligence, overly zealous litigation tactics and malpractice in connection with forcing [IFC] to file for bankruptcy protection within ninety (90) days of First Chicago having perfected its security interest by filing one or more financial statements." They also allege that Third-Party Defendants "failed to act as reasonable and careful lawyers would act and undertook their representation in a careless and negligent manner" because "[a]ny attorney exercising ordinary care would have known the risk of initiating aggressive legal action against a debtor in IFC's position within 90 days of perfecting a security interest against IFC, and would have advised its client that the appropriate course of action was to wait until after [90 days had passed] to initiate litigation against IFC." Defendants further allege that if Third-Party Defendants "had not caused First Chicago to initiate the State Court Action against IFC within 90 days of perfecting First Chicago's interest in the collateral, IFC would not have filed for bankruptcy protection within the Avoidance Period and First Chicago would not have lost its perfected security interest in the collateral," and that "[i]f First Chicago had not lost its perfected security interest in the collateral, First Chicago would not have incurred any damages as a result of the Bankruptcy Case because the collateral consisted of performing leases, which security would have accomplished the repayment of First Chicago's loan to IFC." Defendants contend that under Illinois's Joint Tortfeasor Contribution Act ("the Act"), 740 ILCS 100/0.01 *et seq.*, they are entitled to contribution from Third-Party Defendants "in an amount commensurate with Third Party Defendants' degree of fault in causing Plaintiff's injuries and damages and/or to the extent of its liability under Illinois law."

## II. Discussion

Third-Party Defendants have moved to dismiss the third-party complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). [28]. The purpose of a Rule 12(b)(6) motion to dismiss is not to decide the merits of the case; a Rule 12(b)(6) motion tests the sufficiency of the complaint, or, in this case, the third-party complaint. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). In reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in Defendants' third-party complaint and draws all reasonable inferences in their favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011); *cf. Scott v. City of Chi.*, 195 F.3d 950, 952 (7th Cir. 1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.").

The Illinois Supreme Court has held that a defendant asserting a right of contribution under the Act must demonstrate that 1) the defendant and the third party are "subject to liability in tort to the [plaintiff], and 2) their liability must arise out of the same injury." *Alper v. Altheimer & Gray*, 257 F.3d 680, 684 (7th Cir. 2000) (quoting *People v. Brockman*, 592 N.E.2d 1026, 1029 (Ill. 1992)); see also 740 ILCS 100/2. Third-Party Defendants' motion to dismiss takes aim at both elements.

Third-Party Defendants first contend that the third-party complaint fails to plead the existence of any negligent conduct and therefore fails to allege that Third-Party Defendants are potentially subject to liability in tort to FDIC. "To prevail on a legal malpractice claim the plaintiff client must plead and prove that he defendant attorneys owed the client a duty of due care arising from the attorney-client relationship, that the defendants breached that duty, and that as a proximate result, the client suffered injury." *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 394 (Ill. 2006); see also *Alper v. Altheimer & Gray*, 257 F.3d 680, 684 (7th Cir. 2000) (same). As to negligent conduct, the only element of the legal malpractice claim that Defendants challenge, Defendants allege that Third-Party Defendants "each breached their duties to exercise reasonable care and skill in one or more" of six enumerated ways, including "failing to file UCC financing statements on behalf of First Chicago prior to June 4, 2009," "filing emergency receivership and temporary restraining order litigation against IFC within 90 days of having filed UCC financing statements on behalf of First Chicago," and "failing to recognize that filing emergency * * * litigation against IFC within 90 days of having filed UCC financing statements on behalf of First Chicago was reasonably likely to result in IFC filing for bankruptcy protection within the Avoidance Period." [19 ¶ 29]. These allegations, which are supported by additional factual allegations, are not so conclusory as to render them insufficient to state a claim

for negligence. Defendants, who were not privy to the communications between First Chicago and successor counsel, need not lay all the factual cards – *i.e.*, the precise advice given or not given to First Chicago – on the table to give Third-Party Defendants fair notice of the contribution claim against them.

The Court also rejects Third-Party Defendants' unsupported assertion that "Defendants' grouping of the third party defendants subsequent to Paragraph 9 [of the third-party complaint] flunks the *Twombly-Iqbal* pleading standard." [30 at 13-14].[2] "Although it is true that Plaintiff['s] complaint does not explicitly parse which of the named [Third-Party] Defendants were responsible for which of the above acts or omissions, that level of specificity is not required under federal notice pleading standards." *Warren ex rel. Warren v. Dart*, 2010 WL 4883923, at *7 (N.D. Ill. Nov. 24, 2010) (citing *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)); *cf. Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009) (holding that a "prisoner's statement that he repeatedly alerted medical personnel to a serious medical condition, that they did nothing in response, and that permanent injury ensued, is enough to state a claim on which relief may be granted – if it names the persons responsible for the problem"). The third-party complaint names the persons allegedly responsible for the alleged misconduct and plausibly supports an inference that Third-Party Defendants acted in derogation of their duties to First Chicago. That being said, once Defendants have conducted full discovery, they will need to marshal detailed facts about each individual Third-Party Defendant's role in the alleged negligent conduct to survive summary judgment.

---

[2] The Court notes that the allegations of negligence and negligent conduct asserted in Plaintiff's complaint – drafted at the time Plaintiff was represented by Third-Party Defendants – are asserted in virtually identical fashion. *Compare* [1-1 ¶ 56] ("The Defendants each breached their duties to exercise reasonable care and skill in one or more of the following respects") *with* [19 ¶ 29] ("Third Party Defendants each breached their duties to exercise reasonable care and skill in one or more of the following respects").

9

Third-Party Defendants' second argument in support of dismissal focuses on the "same injury" requirement. Here, they contend that the "gravamen of Defendants' claim is that Katten failed to mitigate First Chicago's damages by not informing First Chicago of the consequence of seeking an [sic] injunctive relief within ninety days of filing UCC financing statements. * * * [T]hat would constitute a separate harm from negligently failing to secure First Chicago's loan to IFC in the first instance." [30 at 11]. Third-Party Defendants acknowledge the Seventh Circuit's assessment in *Alper v. Altheimer & Gray*, 257 F.3d 680, 686-87 (7th Cir. 2001), that Illinois courts define "injury" broadly, but assert that "*Alper* is no longer good law in light of later Illinois state decisions and clarification of pleading standards that contradict the premise of the *Alper* decision." *Id.* The "later Illinois state decisions" to which Third-Party Defendants point the Court are *Auten v. Franklin*, 942 N.E.2d 500, 508-09 (Ill. App. Ct. 2010), and *Sakellariadis v. Campbell*, 909 N.E.2d 353, 360-61 (Ill. App. Ct. 2009).

In an action in which this Court must determine the substantive content of state law, this Court's "task is to ascertain the substantive content of state law as it either has been determined by the highest court of the state or as it would be by that court if the present case were before it now." *Thomas v. H & R Block E. Enters., Inc.*, 630 F.3d 659, 663 (7th Cir. 2011). "To the extent that the state's highest court has not addressed an issue, [the Court] examine[s] the decisions of the lower state courts." *Klunk v. Cnty. of St. Joseph*, 170 F.3d 772, 777 (7th Cir. 1999); see also *Thomas*, 630 F.3d at 663 ("If the state's highest court has yet to rule on an issue, decisions of the state appellate courts control, unless there are persuasive indications that the state supreme court would decide the issue differently." (quotation omitted))).

In *Alper*, a case with facts closely analogous to those here, the Seventh Circuit considered decisions of the Illinois Supreme Court and concluded that court would likely take a broad view

10

of injury. Third-Party Defendants have not directed the Court to any decisions of the Illinois Supreme Court suggesting that the Illinois Supreme Court has changed its stance since *Alper* was decided. The decisions to which Third-Party Defendants point are both decisions of lower Illinois courts, which would be persuasive in the absence of guidance from the Illinois Supreme Court but are of minimal value here, where both the Seventh Circuit and the Illinois Supreme Court itself have suggested that the Illinois Supreme Court would take a broad view of the injury alleged here. In *Board of Trustees of Community College Dist. No. 508, County of Cook v. Coopers & Lybrand*, 803 N.E.2d 460 (Ill. 2003), which was decided after *Alper*, the Illinois Supreme Court took a broad view of injury in a case involving alleged professional negligence. In *Coopers & Lybrand*, plaintiff sued two of its auditors for failure to detect and alert it to financial malfeasance by one of its corporate officers. Both firms failed to detect the malfeasance, and plaintiff incurred its injury after both had scrutinized its books. In determining whether the auditing firm that lost at trial could seek a setoff from the one that settled with plaintiff before trial, the Illinois Supreme Court first "determine[d] whether the harm inflicted by the failed audits arose out of the same injury or indivisible harm." *Coopers & Lybrand*, 803 N.E.2d at 471. Applying the same reasoning it had in cases pre-dating *Alper*, and looking to the rules set forth in RESTATEMENT (SECOND) OF TORTS § 433A (1965), the Illinois Supreme Court explained:

> The Board's complaint alleged that the investments resulting in the precipitous losses were not made until both Andersen and Coopers had completed their audits. Thus, if either auditing firm had informed the Board that the securities in the City Colleges' portfolio violated its investment policy, the Board could have ended those investment practices and the later investments that ultimately resulted in the claimed losses would not have occurred. Since any of the audits should have discovered and reported the continuing investment policy violations, it cannot be said that any one of the three audit failures was the sole cause of that harm. It is therefore irrelevant that the failed audits occurred at different times. * * * We conclude that the damages claimed against Andersen were exactly the same

as, and indivisible from, those claimed against Cooper. The evidence adduced at trial established the entire amount of the claimed indivisible loss alleged in the amended complaint. Therefore, we hold that the appellate court erred when it concluded that the harm could be divided into portions, separately attributable to each defendant.

*Id.* at 472-73.

The harm alleged by FDIC here is similar to that alleged in *Coopers & Lybrand*. First Chicago realized substantial financial injuries only after both professionals hired to handle its affairs addressed the matter, and either one of them allegedly should have handled the matter differently. The Court therefore concludes, as the Seventh Circuit did in *Alper*, that the Illinois Supreme Court would view the injury alleged here as an indivisible or "same" injury for which contribution may be pursued. *Cf. N. Ill. Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 837 N.E.2d 99, 106-07 (2005) ("For purposes of a legal malpractice action, a client is not considered to be injured unless and until he has suffered a loss for which he may seek monetary damages.").

Third-Party Defendants' final argument in support of dismissing the third-party complaint rests entirely upon likening their case to *Ragusa v. City of Streator*, 95 F.R.D. 527 (N.D. Ill. 1982). In *Ragusa*, the plaintiff sued the City of Streator and several of its officers for alleged violations of his civil rights and negligence under state law. The plaintiff alleged that he suffered damage when the individual defendants impounded his truck and then improperly refused to complete the proper release forms when the plaintiff requested that they do so. The City and individual defendants sought leave from the court to file a third-party complaint for contribution against the plaintiff's lawyer, who allegedly had in his possession a title certificate for the plaintiff's truck but failed to inform him of its receipt or furnish it to the defendants. The court denied leave to file the contribution action. The court interpreted the language of what is

now 740 ILCS 100/2(b), "[t]he right of contribution exists only in favor of a tortfeasor who has paid more than his pro rata share of the common liability, and his total recovery is limited to the amount paid by him in excess of his pro rata share. No tortfeasor is liable to make contribution beyond his own pro rata share of the common liability," to mean that "the right of contribution ripens into a cause of action [only] when the tortfeasor pays more than his proportionate share of the underlying claim." That is, the court concluded that the payment of more than one's fair share of the liability is a precondition to a contribution action. This precondition could never be met in *Ragusa*, the court concluded, because defendants' affirmative defense of comparative negligence, if successful, would reduce defendants' liability to the same degree that the contribution claim would entitle them to contribution if they were held accountable for plaintiff's entire loss. "Thus any judgment against defendants will be reduced to the extent [the plaintiff's lawyer] is found negligent, and the critical prerequisite for any contribution claim against [him] will therefore never be met." *Ragusa*, 95 F.R.D. at 529.

In the three decades since *Ragusa* was decided, the Illinois Supreme Court has clarified that "there need not be actual tort liability in order to state a cause of action for contribution." *People v. Brockman*, 574 N.E.2d 626, 635 (Ill. 1991). "All that is required" to assert a contribution claim "is that the persons seeking contribution and the persons from whom contribution is sought be potentially capable of being held liable to the plaintiff in a court of law or equity." *Vroegh v. J & M Forklift*, 651 N.E.2d 121, 125 (Ill. 1995). Indeed, 740 ILCS 100/5 provides that claims for contribution "may be asserted by counterclaim or by third-party complaint in a pending action," presumably before any payment has been ordered or made. See also 740 ILCS 100/2(a) ("[W]here 2 or more persons are subject to liability in tort arising out of the same injury to person or property, there is a right of contribution among them, even though

judgment has not been entered against any or all of them."). Moreover, and more directly related to Third-Party Defendants' argument, the Illinois Supreme Court has held that "the existence of a possible affirmative defense cannot alter the fact that at the time of the injury for which the defendant is partly responsible, the defendant is 'subject to liability in tort' within the meaning of the Contribution Act." *Vroegh*, 651 N.E.2d at 126. The court explained that "[t]he reason for this lies in the nature of affirmative defenses * * * [which do] not negate the essential elements of the plaintiff's cause of action * * * [but instead] admit[ ] the legal sufficiency of that cause of action." *Id.* at 125-26. Thus, a defendant's "potential tort liability remains unless he properly invokes the defense and until he can establish that it is meritorious." *Id.* at 126. In light of these pronouncements from the Illinois Supreme Court, the Court is not persuaded by Third-Party Defendants' contentions that "as in *Ragusa*, there is no plausible scenario pleaded in Defendants' Third-Party Complaint wherein Defendants would be liable for more than their proportionate share of common liability." The Court therefore denies Third-Party Defendants' motion to dismiss the third-party complaint [28].

## III. Conclusion

For the foregoing reasons, the Court denies Third-Party Defendants' motion to dismiss the third-party complaint [28]. Per the parties' oral request at the February 14, 2013 motions hearing, and the terms of the Court's earlier order [31], the Court lifts the stay that has been in place during the pendency of the instant motion to dismiss. The parties are directed to confer and to submit a proposed discovery plan by March 15, 2013.

Dated: March 1, 2013

                                                Robert M. Dow, Jr.
                                                United States District Judge